UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

KAREN SCALIN, JOSIANE PIQUARD
and ROLAND CHARRIER, on behalf of
themselves and all others similarly situated,

*Plaintiffs*;

v.

SOCIÉTÉ NATIONALE DES CHEMINS
DE FER FRANÇAIS,

*Defendants.*

Case No. 1:15-cv-03362
Hon. Andrea R. Wood

## MOTION TO INTERVENE TO SUBMIT AMICUS BRIEF

Pursuant to Local Rule 5.6, Mr. Serge Klarsfeld, as President of *Fils et filles de déportés juifs de France* ("FFDJF"), an organization created to advocate for the sons and daughters of French victims of the Holocaust, does hereby move to intervene in the instant cause for the sole purpose of seeking leave to file an amicus brief in support of Defendant's Rule 12 Motion to Dismiss.

### ARGUMENT

Mr. Klarsfeld is the world's leading authority on events in France during World War II related to the Holocaust. As such, he has unique credibility to comment on the claims made by the Plaintiffs regarding the actions of the Defendants and other French actors during the Holocaust. In English, Mr. Klarsfeld's group would be translated as: "Sons and Daughters of Deported French Jews."

Only Mr. Klarsfeld, with advice from counsel, authored the proposed amicus brief (attached as Exhibit A). No party made a monetary contribution nor gave any other consideration for its preparation or its submission.

CH01\KentE\486609.1

This Court should grant Mr. Klarsfeld leave to intervene for the limited purpose of submitting an amicus brief. Mr. Klarsfeld can provide unique perspective of the Plaintiffs' claims made by the about the events in France surrounding the Holocaust. Mr. Klarsfeld's father was arrested by the Nazis in France and deported to Auschwitz where he was murdered along with tens of thousands of other French Jews.

After World War II, Mr. Klarsfeld devoted himself to finding justice for Jews in France and throughout Europe. In addition to having founded the FFDJF, Mr. Klarsfeld is a leading historian on the Holocaust with unique knowledge of events in France. He has also been a leading advocate for punishing Nazis and French collaborators for their wartime crimes. His work has assisted in bringing many, including Klaus Barbie, to justice. Largely in recognition of his work, in 1984 France named Mr. Klarsfeld to France's Legion of Honor—the country's highest decoration. In 2014, he rose in the Legion of Honor to Grand Officer, the Order's penultimate rank.

Mr. Klarsfeld and the FFDJF also consulted with the French government on a recent agreement reached with the United States on Holocaust reparations for Jews deported from France during the Holocaust. There is simply not a more widely recognized expert on the claims made by the Plaintiffs than Mr. Klarsfeld. Counsel for the Plaintiffs has voiced an objection to this Petition and for the filing of the proposed amicus brief. Counsel for Defendant has no objection. Neither Mr. Klarsfeld nor the FFDJF seek a role in the instant litigation other than the proposed amicus submission and to serve as a resource as the Court may require.

WHEREFORE, Mr. Serge Klarsfeld does hereby seek leave to intervene and for leave to formally file his proposed amicus brief in support of the Defendant's Rule 12 Motion to Dismiss.

        Respectfully submitted,

        */s/ Matthew Luzadder*
        Matthew Luzadder
        Matthew C. Luzadder (#6283424)
        KELLEY DRYE & WARREN LLP
        mluzadder@kelleydrye.com
        333 West Wacker Drive - Suite 2600
        Chicago, IL 60606
        (312) 857-7070


        Paul Rosenthal (*Admitted Pro Hac Vice*)
        KELLEY DRYE & WARREN LLP
        prosenthal@kelleydrye.com
        3050 K Street, N.W., Suite 400
        Washington, D.C. 20007
        (202) 342-8400

        *Counsel to Proposed Defendant-Intervenor*

Dated: September 21, 2015

3

CH01\KentE\486609.1

# **EXHIBIT A**

# LES FILS ET FILLES DES DEPORTES JUIFS DE FRANCE

## Militants de la Mémoire

### F.F.D.J.F.

Association régie par la Loi de 1901

32, rue La Boétie – 75008 Paris

Président : Me Serge Klarsfeld

Téléphone : 01 45 61 18 78 /Fax 01 45 63 95 58 E.Mail : Klarsfeld.ffdjf@wanadoo.fr

---

I am president of the association "Sons and Daughters of Deported French Jews" (*Fils et Filles des Déportés Juifs de France*). Those responsible for deporting French Jews were tried and sentenced in particular due to the action of our association. Examples include the Lischka, Hagen, and Heinrichsohn cases (Cologne 1980); the Leguay and Bousquet case; and the trials of Paul Touvier (1994) and Maurice Papon (1998).

Over the last thirty years, our association has prized the truth above all else. We have reconstructed the public records for every deportee and established the final number of deportees at 75,721, whereas until 1978 the official French statistics gave the figure as 100,000 and the German official statistics 50,000-65,000; we have demonstrated and explained the decisive role of the French population and the clergy in saving Jewish families. The Sons and Daughters of Deported French Jews are opposed to putting on trial SNCF, which never acted on criminal basis but was forced by the German and Vichy authorities to cooperate in allowing the passage of military and civilian trains on French territory.

We have obtained reparations from the French government: a life indemnity for orphans of Jews deported from France (more than a billion euros already paid); a possibility for each person who has a material claim to bring that claim before a Commission (CIVS) and to obtain compensation (nearly 500 million euros already paid); and the creation of the Foundation for the Memory of the Shoah with capital of 500 million euros. We have achieved all of that since 2000.

—

Between 1945 and 2015, approximately one thousand testimonies, manuscripts and other works have been published by French Jews who survived deportation. To my knowledge, none of them mentions participation of SNCF employees in the spoliation, theft or unlawful seizure of Jewish property.

1

In fact, the procedures used to deport French Jews contradict the claim that SNCF or its employees seized Jewish property.

The deportation convoys carrying victims to the death camps were under constant surveillance. When a deportation convoy was formed, the wagons were empty. At Drancy (just outside Paris), which was the point of departure for 67 of the 75 major convoys, trains left from the station at Le Bourget, then Bobigny, under the strict surveillance of the German authorities. Until spring 1943 these trains were escorted to the German border by French gendarmes and by German military personnel. From the German border, the German police had sole responsibility for escorting and surveilling the convoys. Beginning in spring 1943, all convoys within France were escorted solely by German personnel.

Originally the departure platforms were under the joint authority of German and French police, and later solely under the German authorities, who were so uncompromising that there were no more than a handful of escapes from departing convoys—fewer than about ten out of a total of 70,000 deportees.

As for baggage, Nazi regulations were clear. Until deportation convoy no. 55 of 23 June 1943, the first organized by SS officer Alois Brunner, deportees could carry only limited luggage defined by the Germans in very detailed instructions.

By contrast, Brunner authorized deportees to carry as much luggage as possible; this maximized the booty that the SS would recover on arrival at Auschwitz. From June 1943 to August 1944 Jewish prisoners with baggage loaded the convoy wagons themselves under the supervision of the SS. They were called "porteurs"
In addition, for each convoy Brunner organized the departure of a wagon loaded with goods that purported to be for the deportees but in fact were added to the spoliated property that arrived in Auschwitz under procedures that are well known and well documented by survivors, by historians and by the German courts (the so-called "Canada" warehouses).

Under these circumstances, the few SNCF employees present at the departure of the convoys would have been unable to steal or forcibly take the deportees' possessions. On the contrary, and as deportees themselves have stressed, SNCF employees went so far as to collect messages thrown by deportees onto the tracks and send these, at their own expense, to the intended recipients.

German documentation never mentions SNCF itself being involved in organizing departures; it refers solely to the French and German police. Nor is there any mention of SNCF organizing confiscation of deportees' property at departure, which would have violated the guidelines for deportee baggage.

**When Jews were transferred from areas other than Paris to Drancy**, there were three different scenarios: transfer of 10,000 Jews from unoccupied France; transfer of Jews from occupied France; and, starting in November 1942, transfer of Jews from points throughout France :

1. Transfer of 10,000 Jews from unoccupied France to Drancy. This took place almost exclusively in boxcars under the control and surveillance of the French police, ruling out the possibility that anyone could steal belongings carried by Jewish transferees. Even collection of toilet buckets was carefully monitored by the French police.

2. Transfer of Jews from occupied France to Drancy, through November 1942. Such transfers usually took place in passenger cars under the surveillance of the French gendarmes from departure to arrival. Each transferee carried his or her own belongings; no one would have been able to steal them, as might have been the case had they been stored in a wagon.

3. Transfer of Jews from points throughout France to Drancy, starting in November 1942. This followed the procedure described in point 2, and starting in autumn 1942 was under the sole surveillance of the German police, in conditions that made it absolutely impossible for anyone to wrongfully seize the belongings of deportees.

**We can therefore declare that the belongings of Jews who were transferred within France and then deported were under constant surveillance by the French and/or German police.**

Spoliation could and very definitely did take place:

- At the time of arrest, when the person arrested left behind property that fell into official hands (e.g., the French Administration des Domaines, or Land Office) or into private hands
- When Jews arrived in Drancy, their cash, securities and jewelry were confiscated by the prison camp administration and then split between the German and French treasuries. And in summer 1942, when the special police for Jewish issues (Police aux Questions Juives, PQJ) were given responsibility for searching prisoners, spoliation became the rule.

**The allegation that SNCF and SNCF employees spoliated Jewish deportees is not consistent with historical accounts or historical truth.**

*Serge Klarsfeld*
Serge Klarsfeld
President