**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN SCALIN, JOSIANE PIQUARD, and ROLAND CHERRIER, | ) ) ) | |
| Plaintiffs, | ) ) | No. 15-cv-03362 |
| v. | ) ) | Judge Andrea R. Wood |
| SOCIÉTÉ NATIONALE DES CHEMINS DE FER FRANÇAIS, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Karen Scalin, Josiane Piquard, and Roland Cherrier claim that during World War II, Defendant Société Nationale des Chemins de Fer Français ("SNCF"), the national railway of France, transported their family members to Nazi concentration camps. Plaintiffs allege that in connection with the deportations, SNCF confiscated the Holocaust victims' personal property (such as cash, jewelry, and artwork), either converting the property to its own benefit or turning it over to the Nazis. On behalf of themselves and a purported class of similarly-situated individuals, Plaintiffs seek compensation for the alleged takings, which they claim violated international law. Before the Court is SNCF's motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (3), and (6). (Dkt. No. 18.) For the reasons explained below, the motion is granted.

## BACKGROUND

The following facts are taken from Plaintiffs' complaint, which "is stated upon information and belief, based on published research concerning SNCF's activities during and after the War." (Compl. ¶ 5, Dkt. No. 1.) During World War II, the French government established and

ran holding camps in France from which Jewish people and other "undesirables" were deported to Nazi concentration camps. (*Id.* ¶ 6.) SNCF assembled and ran the deportation trains, billing the Nazis per head, per kilometer at standard third-class rates (although the Holocaust victims were transported in rail cars normally used for cattle). (*Id.* ¶¶ 8–9.) The deportees were generally allowed to bring one suitcase or parcel with them as they boarded the SNCF trains. (*Id.* ¶ 10.) While in transit, SNCF confiscated the victims' belongings, thereafter converting the property to its own benefit or turning it over to the Nazis in exchange for cash and good will. (*Id.*) Plaintiffs allege that to this day, SNCF retains their relatives' property or the proceeds from it, and that no compensation has been made to the victims (*Id.* ¶¶ 13–14.)

Plaintiffs assert three claims for relief here. Plaintiffs first allege that SNCF expropriated their family members' property in violation of international law, both customary and treaty, by taking the property on a discriminatory basis, for no public purpose, and without just compensation. They further allege that the takings were an integral part of the genocide against Jews during World War II. Plaintiffs' second and third claims for relief consist of state common law claims for conversion and unjust enrichment, respectively. The putative class includes all individuals transported by SNCF between holding camps in France or from France to Nazi concentration camps, and their heirs and beneficiaries.

In its motion to dismiss Plaintiffs' complaint, SNCF argues that it is an instrumentality of the French government entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and therefore this Court does not have subject-matter jurisdiction over Plaintiffs' claims. SNCF further argues that (1) the Court lacks personal jurisdiction over it; (2) Plaintiffs have not established standing; (3) Plaintiffs' claims are barred by the statute of limitations; (4) the complaint should be dismissed on the grounds of *forum non*

*conveniens*; (5) principles of international comity similarly require dismissal; and (6) this lawsuit presents a non-justiciable political question.

## DISCUSSION

When a complaint is challenged for lack of subject-matter jurisdiction, the district court may look beyond the pleadings and view whatever evidence has been submitted on the issue to determine whether subject-matter jurisdiction in fact exists. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal citations omitted).[1] The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing that it exists. *See id.* at 444–45. *See also Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014) ("[A] plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met.") (internal citation omitted).

### I.    FSIA Immunity and the Expropriation Exception

Because it is undisputed that SNCF is wholly owned by the French government, the Court's subject-matter jurisdiction over Plaintiff's claims depends upon application of the FSIA. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 743 (7th Cir. 2007). Under the FSIA, a foreign state and its instrumentalities are immune from suit in U.S. courts unless a specific statutory exception applies. *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 669

---

[1] Such is the case only when evaluating a factual challenge to subject-matter jurisdiction. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Digital, Inc.*, 572 F.3d at 443–44). A factual challenge contends that there is in fact no subject-matter jurisdiction, whereas a facial challenge asserts that the plaintiff has not sufficiently alleged a basis for subject-matter jurisdiction. *Id.* "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.* Here, SNCF raises both types of challenges, contending that certain requirements of the expropriation exception to FSIA immunity are not met in fact and that Plaintiffs' allegations are inadequate with respect to others. As discussed below, the instant motion turns on whether Plaintiffs have satisfied the expropriation exception's exhaustion requirement. The Court will therefore treat SNCF's challenge to subject-matter jurisdiction as factual and, accordingly, consider the evidence submitted by the parties on the exhaustion issue.

(7th Cir. 2012) (citing 28 U.S.C. § 1604). Here, Plaintiffs invoke the expropriation exception set forth in § 1605(a)(3) of the FSIA. That exception provides as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). "To break that down, the expropriation exception defeats sovereign immunity where (1) rights in property are in issue; (2) the property was taken; (3) the taking was in violation of international law;[2] and (4) at least one of the two nexus requirements is satisfied." *Abelesz*, 692 F.3d at 671. SNCF argues that Plaintiffs' complaint fails because it does not adequately allege a taking and because there is no nexus to the United States (as SNCF does not own or operate Plaintiffs' property and is not engaged in commercial activity in the United States).

According to SNCF, even if the four elements of the FSIA's expropriation exception were met, the complaint must be dismissed because Plaintiffs have failed to exhaust domestic remedies in France. In *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012), the Seventh Circuit

---

[2] To find that a plaintiff has met the third element of the expropriation exception (a taking in violation of international law) is not to find that he or she has stated a claim for expropriation in violation of international law. "The FSIA is a jurisdictional statute and does not create an independent cause of action." *Abelesz*, 692 F.3d at 696. The FSIA's expropriation exception authorizes jurisdiction over claims for the taking of property in violation of international law. *Id.* at 697. But "[t]he FSIA does not tell us when property was expropriated 'in violation of international law'—we must look to other domestic and international legal sources to make that determination." *Id.* at 696. In *Abelesz*, the Seventh Circuit held that allegations that the Hungarian national railway participated in expropriating property from Hungarian Jews during the Holocaust were sufficient to demonstrate a violation of international law due to the genocidal nature of the expropriations. *See id.* at 673–77. *See also Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 857–58 (7th Cir. 2015) (noting that if the Seventh Circuit had not considered the genocidal nature of the takings at issue in *Abelesz*, it could not have found that violations of international law had been alleged; instead, the court would have applied the domestic takings rule to find that the Hungarian government's expropriations of property from its own nationals did not violate international law, consistent with the text of § 712(1) of the Third Restatement of Foreign Relations Law).

held that although the FSIA itself does not impose a statutory exhaustion requirement, international law requires exhaustion of domestic remedies before a plaintiff can assert a claim for expropriation in violation of international law. *See id.* at 678–82. *See also Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 854 (7th Cir. 2015) ("Even though § 1605(a)(3) itself does not require exhaustion . . . the provision's reliance on international law norms ma[kes] clear that plaintiffs [] need to exhaust domestic remedies before they [can] assert a violation of customary international law in a United States court.") Therefore, a plaintiff must either demonstrate that he or she has pursued and exhausted domestic remedies or "show convincingly that such remedies are clearly a sham or inadequate or that their application is unreasonably prolonged." *Abelesz*, 692 F.3d at 681 (citing Restatement (Third) of Foreign Relations Law § 713 cmt. f). *See also Fischer*, 777 F.3d at 855 ("[I]nternational law favors giving a state accused of taking property in violation of international law an opportunity to 'redress it by its own means, within the framework of its own legal system' before the same alleged taking may be aired in foreign courts.") (quoting *Abelesz*, 692 F.3d at 680).

## II.    Exhaustion of Domestic Remedies

In their complaint, Plaintiffs assert that "[a]ll legal remedies of any nature in France permitting victims to seek redress against SNCF have been exhausted." (Compl. ¶ 34, Dkt. No. 1). According to Plaintiffs, claims brought against SNCF in France were dismissed by the highest court and, following that precedent, all other cases against SNCF have been dismissed.[3] Plaintiffs

---

[3] SNCF notes that the case Plaintiffs rely on for this assertion was brought by an individual (not a party to this case) for transport to a French internment camp, not expropriation. In response, Plaintiffs have submitted the declaration of Corinne Hershkovitch, a lawyer in France who has been working on Holocaust claims for 20 years. (Hershkovitch Aff. ¶ 1, Pls.' Resp. to Def.'s Mot. to Dismiss, Dkt. No. 51-4.) Hershkovitch opines that "it is highly probable, if not absolutely mandated" that Plaintiffs' claims against SNCF are not viable in any court—criminal, civil, or administrative—in France. (*Id.* ¶ 8.) Hershkovitch explains that, in 1992, a revision to the French penal code allowed for criminal charges to be brought against companies or institutions for the first time. (*Id.* ¶ 4.) However, the change did not apply

also assert that the programs established by the French government for Holocaust victims are limited in scope and do not compensate deportees or their heirs for property taken on SNCF trains. In particular, Plaintiffs contend that the Commission for the Compensation of Victims of Spoliations Resulting from the Anti-Semitic Legislation in Force During the Occupation ("CIVS" or the "Commission") does not compensate victims and their relatives for property taken by SNCF. SNCF, on the other hand, argues that Plaintiffs' claims are eligible for compensation by CIVS and that recourse to that remedial scheme is required under Seventh Circuit precedent.

In support of its position, SNCF has submitted the declaration of CIVS's Chairman, Michel Jeannoutot. The declaration provides background on the history and purpose of the Commission as well as an organizational overview and a summary of the claims process. Jeannoutot explains that CIVS is an administrative commission of the French government under the Prime Minister. (Jeannoutot Aff. ¶ 4, Memo in Supp. of Def.'s Mot. to Dismiss, Attach. 3, Dkt. No. 19-3.) The Commission was established by decree in 1999 to compensate the victims of confiscations carried out by the Nazis and the Vichy authorities during World War II. (*Id.*) CIVS investigates claims, determines the nature and extent of material losses, and submits recommendations for compensation to the Prime Minister or any other institution involved

---

retroactively, "effectively blocking any access to criminal courts for redress for conduct during World War II such as the wrongful conduct alleged against SNCF in the instant action." (*Id.*)

With respect to the civil court system, a suit was filed in 2003 against SNCF for its deportation of Jews in collaboration with the Nazis. (*Id.* ¶ 5.) The civil court did not rule on the merits of the case but held that the 30-year statute of limitations on civil actions against state enterprises had run. (*Id.*) That decision was affirmed by the court of appeals in 2004. (*Id.*) Finally, a suit was filed in an administrative court alleging that the claimants' relatives had been wrongfully detained and transported by SNCF to an internment camp. (*Id.* ¶ 6.) The claimants obtained a favorable judgment but the administrative court of appeals overturned the decision on the jurisdictional ground that SNCF at the time was acting as a private entity and was therefore subject to private, and not administrative, law. (*Id.* ¶¶ 6–7.) That decision was affirmed by the highest court of France. (*Id.* ¶ 7.)

Based on the foregoing, Hershkovitch concludes that claims such as Plaintiffs'—regardless of whether in the nature of personal injury, crimes against humanity, or for restitution of property wrongfully taken on deportation trains—would be rejected in criminal, civil, and administrative courts on statute of limitations or jurisdictional grounds. (*Id.* ¶ 8.)

(namely, banks). (*Id.*) At the end of 2014, nearly 29,000 claims had been filed with CIVS, approximately 19,000 of which were for "material spoliations" (as opposed to "bank-related spoliations"— seizures of assets in banks or the contents of safety deposit boxes).

(*Id.*) And as of December 31, 2014, nearly 500 million euros in compensation had been recommended for material spoliations claims. (*Id.*) Jeannoutot notes that France has not set a ceiling for the amount of compensation or a deadline for filing claims. (*Id.*)

CIVS accepts claims from direct victims of spoliations and their legal heirs or assigns— regardless of the claimant's nationality and country of residence. (*Id.* ¶¶ 17–18, 27.) To file a claim, the claimant simply sends a letter, fax, or email, or completes the claim form available on the Commission's website. (*Id.* ¶ 27.) There is no fee associated with the filing of a claim; the process is free of charge. (*Id.*) According to Jeannoutot, the claims process is collaborative; CIVS personnel frequently communicate with claimants and their representatives to assist them in managing each step of the process. (*See, e.g., id.* ¶¶ 16, 28, 37–38, 41–42, 47–48.) For example, the Commission's administrative unit contacts claimants directly to collect information that is essential for processing their claim. (*Id.* ¶ 28.)

Once a claim has been filed, the administrative unit conducts research in specialized archives. (*Id.* ¶¶ 9, 29–33.) Sitting or retired judges known as "rapporteurs" are responsible for conducting an investigation into the claim once the administrative unit's research is complete. (*Id.* ¶¶ 34–35.) At the conclusion of the investigation, the rapporteur prepares a compensation proposal based on the type and extent of the verified spoliations. (*Id.* ¶ 39.) Jeannoutot notes that because it is not always possible to gather evidence of losses sustained during deportations, interments, or other events, CIVS often relies on good-faith estimates. (*Id.* ¶ 14.) The rapporteur's report is sent, along with the claim file, to the Commission's hearings secretariat, which then

schedules a hearing before the deliberative panel. (*Id.* ¶¶ 43, 45.) If a claimant is not satisfied with the rapporteur's investigation, he or she may request additional, or a new, investigation. (*Id.* ¶ 44.)

During the hearing before the deliberative panel, the rapporteur presents his or her report, the claimant is invited to speak, a representative of the government provides an opinion on how to handle the claim, and the panel members ask any questions they may have. (*Id.* ¶ 49.) The claimant may be represented at the hearing by an attorney or any other person of his choosing. (*Id.* ¶ 47.) Jeannoutot notes that CIVS has organized missions to the United States and other countries so that residents who have submitted claims can participate in the hearings more easily and take part in the review of their claim just like claimants residing in France. (*Id.* ¶ 48.) After the hearing, the panel deliberates and issues a recommendation to the office of the Prime Minister. (*Id.* ¶ 49.) Once the panel's recommendation is approved by the Prime Minister, the compensation decision is sent to the National War Veterans Administration for payment. (*Id.* ¶ 50.) Decisions of the Prime Minister may be appealed to a French court of competent jurisdiction. (*Id.*)

Jeannoutot is unaware of any CIVS claim filed for spoliations attributable to SNCF or any other transportation company. (*Id.* ¶ 21.) Most of the material spoliations claims filed to date have been for property confiscated upon arrival at the French internment camps. (*Id.* ¶¶ 4, 21.) Jeannoutot states, however, that if such a claim were filed it would be eligible for compensation by the Commission "according to the current laws." (*Id.* ¶ 21.) Specifically, he concludes that the claims in this lawsuit are covered by CIVS—regardless of who the perpetrators of the spoliations were—because the acts described in the complaint took place on French territory. (*Id.* ¶¶ 55–56.) Jeannoutot also notes that one Plaintiff (Josiane Piquard) and the father of another (Karen Scalin, whose father's name is Fred Bender) previously filed claims with, and obtained compensation from, CIVS for spoliations of which their parents and grandparents were victims. (*Id.* ¶ 54.)

According to Jeannoutot, Piquard and Scalin may submit new claims to the Commission based on facts that were not presented in connection with the prior investigations. (*Id.* ¶ 55.)

Plaintiffs take issue with Jeannoutot's portrayal of the CIVS framework. They contend that his declaration discusses the way in which CIVS should ideally work, while the reality is much different. For example, Plaintiffs assert that there is no presumption of good faith; instead, the Commission requires detailed and specific proof. Plaintiffs further contend that because CIVS is a non-judicial commission, "[t]here are no rules of evidence, no subpoena powers, no written procedures governing awards, no transparency, [and] no objective standards." (Pls.' Response to Def.'s Mot. to Dismiss at 4, Dkt. No. 51.) In addition, Plaintiffs argue that awards by the deliberative panel are arbitrary and subjective. In support, they point to one case in which the panel did not follow the recommendation of the rapporteur (awarding 130,000 euros when the rapporteur had recommended an award of 184,000 euros). Perhaps more importantly, Plaintiffs contend that, contrary to the assertions in Jeannoutot's declaration, CIVS does not provide compensation for personal property taken by SNCF on its trains. Plaintiffs have submitted a copy of CIVS's 2014 annual report, which lists the categories of damages for which the Commission may provide indemnification. (Tamen Aff., Ex. 1, Pls.' Resp. to Def.'s Mot. to Dismiss, Dkt. No. 51-3.) Those categories include (1) looting of apartments or refugee shelters, (2) business and real property spoliation, (3) confiscation of bank accounts and consignment of insurance policies, (4) theft or forced sale of cultural personal property, (5) payment of fees for smuggling to unoccupied France or across borders, and (6) confiscation of money during internment at a camp. (*Id.*) It is Plaintiffs' position that if claims such as theirs "were cognizable, someone would have filed them and received benefits." (Pls.' Response to Def.'s Mot. to Dismiss at 5, Dkt. No. 51.)

In support of their position, Plaintiffs have submitted the declarations of Eric Freedman and Jean-Jacques Fraenkel. Freedman is an academic who, over the course of the past 14 years, has represented approximately 1,200 CIVS claimants. (Freedman Aff. ¶ 8, Pls.' Resp. to Def.'s Mot. to Dismiss, Dkt. No. 51-1.). Fraenkel is the president of a Canadian organization that represents the interests of 18,000 Holocaust survivors across the world. (Fraenkel Aff. ¶ 1, Pls.' Resp. to Def.'s Mot. to Dismiss, Dkt. No. 51-2.) In that capacity, Fraenkel has participated in over 150 meetings with senior officers of CIVS and represented more than 40 CIVS claimants. (*Id.* ¶ 3.) Freedman and Fraenkel are both of the opinion that the Commission is not in a position to pay compensation to Plaintiffs or others in their situation. Fraenkel asserts that suitcases and other personal items taken on SNCF trains are not among those categories of spoliations for which CIVS is authorized or ordered to indemnify. (*Id.* at 5.) Although the Chairman of CIVS states that claims for takings by SNCF would be considered for indemnification, Freedman believes "it is telling that not one such claim in 15 years has ever been heard or awarded indemnification." (Freedman Aff. ¶ 13, Dkt. No. 51-1.) Freedman also notes that SNCF archives are not on CIVS's list of consultable archives and have never been reviewed. (*Id.*)

Moreover, both Freedman and Fraenkel consider CIVS generally to be an inadequate alternative forum. Freedman states that "[t]he recommendations of [the Commission] are not always equitable, and the indemnification that it provides is not always adequate." (*Id.* ¶ 9.) According to Freedman, although the Commission's procedures state that the claim examination process is based on good faith, in practice there is a requirement in most cases of some element of archival or other proof—furnished either by the claimant or by the CIVS researchers—of the taking or spoliation. (*Id.* ¶11.) Fraenkel similarly asserts that while the decree establishing the Commission states that the good faith of the claimant is to be considered, in practice, the

spoliation of property is recognized only if the claimant has formal proof of loss. (Fraenkel Aff. ¶ 6(b), Dkt. No. 51-2.) According to Fraenkel, without such proof, CIVS finds the claim to be unfounded and refuses any and all payment. (*Id.*) Moreover, approximately fifteen percent of claims are rejected for a variety of reasons, including incorrect status, time delays, and lack of specific information. (Freedman Aff. ¶ 11, Dkt. No. 51-1.) And if a claimant wants to oppose an arbitrary decision by CIVS, his or her only choice is to raise the issue before a French tribunal, which is a very long and costly process. (Fraenkel Aff. ¶ 6(d), Dkt. No. 51-2.)

In addition, Freedman and Fraenkel point to the length of the claims process and what they view as arbitrary or inadequate awards. Fraenkel says that claimants generally have to wait three to five years for a decision, and an additional eight months after the decision is rendered before receiving payment. (Fraenkel Aff. ¶ 7, Dkt. No. 51-2.) With respect to awards, Freedman asserts that the recommended indemnification tends to be substantially below current market value in many cases. (Freedman Aff. ¶ 15, Dkt. No. 51-1.) Fraenkel notes that often the Commission does not accept the recommendation of the rapporteur and reduces or rejects the recommended compensation. (Fraenkel Aff. ¶ 10, Dkt. No. 51-2.) Moreover, the majority of claimants receive much less than the value of what was taken. (*Id.* ¶ 12.) Indeed, "[t]here has never been, to [his] knowledge and with all the files that [he] ha[s] been concerned with, a complete indemnification of the value of what was spoliated." (*Id.* at 6.) Fraenkel also voices a number of other complaints about the CIVS process—for example, he states that some rapporteurs treat claimants poorly and, if a claimant attempts to contest the rapporteur's report during the hearing, the panel members are not helpful and may be verbally abusive. (*Id.* ¶¶ 8–9 and at 6.) He concludes that "CIVS does not respond to the needs of the Jews of France or elsewhere, nor to the mission that it was given by the French government"—first, because the methods used for indemnification are particularly

complex and lack transparency and, second, because CIVS works without any judicial control and can therefore do what it wants, and what it wants is to save money for the French government by reducing the amount of awards. (*Id.* at 7.)

In response to the materials submitted by Plaintiffs, SNCF has provided a supplemental declaration by CIVS Chairman Jeannoutot, in which he clarifies that:

> All the spoliations that occurred on French territory during the deportations of Jews from France during World War II are considered by CIVS as spoliations resulting from the Anti-Semitic laws that were in effect during the Occupation. Consequently, CIVS will cover claims for any spoliation that occurred during embarkation or on the trains or other means of transportation as part of these deportations, just as CIVS covers claims for spoliations that occurred during arrests and arrivals in the internment camps.

(Jeannoutot Supp. Aff. ¶ 3, Def.'s Reply in Supp. of Mot. to Dismiss, Dkt. No. 56-1.) Based on his experience as Chairman, and after having reviewed Plaintiffs' allegations, Jeannoutot concludes that if items belonging to Plaintiffs' relatives were seized during the boarding of deportation trains or on the trains in French territory, CIVS is willing and competent to entertain their claims and recommend compensation. (*Id.* ¶ 10.)

Jeannoutot also reiterates that because it may be extremely difficult for victims and their heirs to obtain evidence of spoliations, the Commission's procedures apply somewhat flexible standards of evidence. (*Id.* ¶ 4.) Claimants are not required to provide evidence of the spoliation, and even where CIVS does not discover any evidence in the course of its research, the Commission may recommend compensation. (*Id.* ¶¶ 5-7.)[4] For example, if there is no evidence of the type or amount of property confiscated during internment or an arrest, the Commission recommends a lump sum payment of 930 euros in compensation. (*Id.* ¶ 7) Finally, Jeannoutot

---

[4] Jeannoutot notes that in over three quarters of the claims submitted, CIVS has discovered at least one document that provides circumstantial evidence of spoliation. (Jeannoutot Supp. Aff. ¶ 6, Def.'s Reply in Supp. of Mot. to Dismiss, Dkt. No. 56-1.)

notes that CIVS has recommend compensation that actually exceeds the claimant's expectations or the amount proposed by the rapporteur. (*Id.* ¶ 8.) He points to the claim brought by Plaintiff Scalin's father; he requested only 30,000 USD but was ultimately compensated in the amount of 76,300 euros. (*Id.*)

In their sur-reply, Plaintiffs dispute a number of the statements in Jeannoutot's supplemental declaration.[5] They contend that there is no support for his assertion that claims for property taken on SNCF trains are covered by CIVS. They also assert that Jeannoutot's reference to the claim brought by Fred Bender is inaccurate and incomplete. According to Plaintiffs, Bender applied for compensation only for household furnishings. The rapporteur recommended a lower amount than Bender sought for those items but awarded additional funds for his parents' farm, animals, and other agricultural items for which he had not sought restitution (according to SNCF, because he did not know they were covered). Plaintiffs assert that the Commission reduced the amount proposed by the rapporteur for the household items without explanation and denied Bender's request for an itemized account of the amount awarded. In sum, Plaintiffs contend that Jeannoutot's supplemental declaration "does not demonstrate that CIVS operates in a consistent fashion according to specific and transparent rules [ ] or that it is anything other than arbitrary and capricious in its decisionmaking." (Pls.' Sur-Reply in Opp. to Def.'s Mot. to Dismiss at 1, Dkt. No. 58-1.)

In addition to the papers filed by the parties, the United States has submitted a statement of interest pursuant to 28 U.S.C. § 517, supporting dismissal of this lawsuit on the following

---

[5] Plaintiffs contend that, at best, Jeannoutot's supplemental statements create issues of fact. They request that, if the record with respect to any issue is insufficient to make a definitive determination, the Court order limited formal discovery to complete the record as needed. It is unclear how jurisdictional discovery would bolster Plaintiffs' jurisdictional arguments, however. The Court has already considered the evidentiary materials submitted by both parties and concludes that discovery with respect to these issues would not aid its analysis.

grounds: (1) *forum non conveniens*, (2) principles of international comity, (3) failure to exhaust

domestic remedies, and (4) lack of subject-matter jurisdiction (due to Plaintiffs' failure to plead

adequately the nexus required by the FSIA's expropriation exception). In general, the United

States has supported the dismissal of Holocaust-related claims in U.S. courts in favor of resolution

of those claims through mechanisms established through dialogue, negotiation, and cooperation.

The statement notes that the United States is supportive of the programs established by France to

"provide a redress process and compensation for victims in a manner that serves the vital interest

of compensating Holocaust victims more quickly and efficiently than the litigation process." (U.S.

Stmt. of Interest at 13, Dkt. No. 63.)

At the end of 2014, the United States and France signed an executive agreement (the

"2014 Executive Agreement") designed to expand upon a French pension program pursuant to

which pensions are paid to surviving Holocaust deportees and their spouses. While not directly

relevant to the claims at issue here,[6] the United States notes that:

> The objectives and obligations set forth in the 2014 Executive Agreement
> underscore the continuing commitment of France to provide compensation for and
> resolve Holocaust-related claims, the United States' interest in seeking a resolution
> of such claims outside of judicial proceedings in the United States, as well as the
> recognition by both countries that the CIVS, the French deportation compensation
> programs, and the program for Americans created by the Agreement are the
> exclusive mechanisms through which Holocaust deportation claims against France
> can best be resolved.

(*Id.* at 7.) The United States takes the position that CIVS provides Plaintiffs and other similarly-

situated individuals with an adequate remedy for takings claims against SNCF. The statement of

interest generally supports SNCF's portrayal of CIVS as a fair program that provides

comprehensive relief to a broader class of victims than would be possible in U.S. judicial

---

[6] It is undisputed that the 2014 Executive Agreement does not cover Plaintiffs' claims.

proceedings.[7] Overall, it is the position of the United States that CIVS is an available and adequate alternative forum and that both public and private interests weigh in favor of Plaintiffs utilizing that forum.

Plaintiffs argue that the U.S. government's statement of interest does not merit deference, in part, because it suggests four legal (as opposed to policy-driven) grounds for dismissal and does not argue that U.S. policy interests provide an independent basis for dismissal. According to Plaintiffs, no cognizable interest of the executive branch would be adversely affected by the continuation of this litigation, nor would proceeding with this lawsuit interfere with the 2014 Executive Agreement between the United States and France. In addition, Plaintiffs contend that in its endorsement of CIVS, the United States adds no new information, no direct evidence, no independent verification, and no relevant declarations to strengthen its position. SNCF, on the other hand, argues that the United States's long-standing policy of recognizing French compensation programs as the exclusive fora for the resolution of claims such as those at issue here warrants particular weight.[8]

---

[7] In its statement of interest, the United States points to the following factors in support of its position that CIVS is an adequate alternative forum: (1) claims are evaluated under relaxed standards of proof and paid expeditiously; (2) claimants are permitted to have representatives assist them, and are also assisted by the French government if they live outside of France and by victims' organizations; (3) claimants are entitled to appeal adverse decisions; and (4) CIVS issues regular reports as part of its commitment to operate in a transparent manner. In support, the United States has submitted a 2001 declaration by Stuart Eizenstat, then Deputy Secretary of the Treasury, Special Representative of the President, and Secretary of State on Holocaust Issues. (Eizenstat Aff. ¶ 1, Dkt. No. 63-1.) As noted by Plaintiffs, the declaration was prepared in connection with unrelated Holocaust litigation involving French banks. Plaintiffs argue that Eizenstat's declaration is therefore irrelevant and misleading, in part because much of its discussion of CIVS focuses on bank-related claims. SNCF responds that, on the contrary, Eizenstat's declaration reflects the consistency of the United States' position on the availability, adequacy, and superiority of CIVS over the past 15 years.

[8] Plaintiffs note that, in 2015, a potential class member in this action filed a CIVS claim for property taken from her parents by SNCF during their deportation to Auschwitz on SNCF trains. According to Plaintiffs, the claimant received notice from CIVS denying her claim because her parents had been compensated in 2002 for expropriated property unrelated to SNCF conduct. They claim that this refutes any assertion that CIVS accepts new claims from prior claimants for different property (not the subject of the prior claim).

Finally, an amicus brief in support of SNCF's motion to dismiss has been filed by the Conseil Representatif des Institutions Juives de France ("CRIF"), an umbrella organization consisting of over 60 institutions representing the Jewish community of France. According to its motion to intervene, CRIF has played a prominent role in advancing the interests of Holocaust victims and survivors as well as their descendants. CRIF's brief notes that a fundamental principle of the French compensation programs is that "the French Republic is responsible for reparation for the consequences of the atrocities committed on French Territory" during the Nazi occupation. (CRIF Am. Br. at 2, Dkt. No. 20-1.) CRIF takes the position that the programs implemented by France are quite satisfactory and are actually broader and more generous than those established by other European countries. With respect to CIVS, CRIF asserts that compensation is available for any theft effectively perpetrated on French territory irrespective of the people involved and the methods used. CRIF views the Commission as suitable, fair, and effective and believes that it has consistently provided just and benevolent compensation. CRIF's brief reiterates that that CIVS considers claims without any statute of limitations and irrespective of the nationality of the Holocaust deportees or their descendants.

Taking all of the above into consideration, the Court sees no "legally compelling reason for [P]laintiffs' failure to exhaust [French] remedies, such that the domestic exhaustion rule should not bar their claims." *Abelesz*, 692 F.3d at 682. The Court will assume that French courts are closed to Plaintiffs claims, as SNCF has not presented any convincing argument to the

SNCF objects to the submission of this evidence as a "transparent ploy[] to have the last word about CIVS in what amounts to a sur-sur-reply." (Def.'s Resp. re U.S. Stmt. of Interest at 5, Dkt. No. 71.) Regardless, SNCF asserts that the letter from CIVS attached to Plaintiffs' response (written in French) actually states that because a prior claim was already indemnified, the Commission could not follow up on the new claim "without new element." (*Id.*) According to SNCF, this confirms that CIVS will consider new claims for property not previously compensated based on new information. But even if the claim was rejected, the Court remains unaware of the property for which the claimant was previously compensated. As SNCF points out, if the new claim is for the same property (which the claimant previously asserted was taken by the Nazis but now asserts was taken by SNCF), rejection of the claim would be appropriate.

contrary. With respect to CIVS, however, Plaintiffs have failed "to show convincingly that such remedies are clearly a sham or inadequate or that their application is unreasonably prolonged." *Id.* at 681 (citing Restatement (Third) of Foreign Relations Law § 713 cmt. f).

First, Plaintiffs contention that their claims are not eligible for CIVS compensation has been flatly refuted by the Chairman of the Commission. In his supplemental declaration, Jeannoutot unequivocally states that if the property of Plaintiffs' relatives was seized during the boarding of, or while aboard, SNCF trains in French territory, CIVS is willing and competent to hear the claims and recommend compensation. The statement of interest submitted by the United States and the amicus brief submitted by CRIF both support Jeannoutot's position. And while CIVS's 2014 annual report does not list property taken during deportations as a category of damages for which the Commission may provide compensation, there is no indication that the listed categories are exhaustive or that Plaintiffs' claims could not be considered to fall within the "confiscation of money during internment at a camp" category.

While it appears that the Commission has not awarded compensation for any SNCF-related claims to date, there is no evidence to suggest that such is the case for jurisdictional or eligibility, as opposed to factual, reasons. The lack of such claims may be because there is no evidence (in the possession of potential claimants or in the archives consulted by CIVS) that SNCF expropriated deportees' property—not because if SNCF did so, CIVS would not compensate claimants appropriately. That claims against SNCF may be novel does not necessarily lead to the conclusion that they are ineligible for compensation. And the fact that others have not submitted similar claims does not excuse Plaintiffs from having to exhaust available domestic remedies themselves. However, if Plaintiffs attempt to seek compensation from CIVS "and are

blocked arbitrarily or unreasonably, United States courts could once again be open to these claims." *Fischer*, 777 F.3d at 865–66.

Second, that CIVS is a non-judicial forum and does not operate exactly as a U.S. court—with rules of evidence, subpoena powers, etc.—does not mean that it is inadequate. The Seventh Circuit has held that Plaintiffs must exhaust domestic remedies; nowhere has the court stated that such remedies must be judicial in nature. *See Abelesz*, 692 F.3d at 684 ("[T]here is no reason for U.S. courts to take up these claims without a persuasive showing that Hungarian *law* is unresponsive.") (emphasis added). *See also Fischer*, 777 F.3d at 855 ("[I]nternational law favors giving a state accused of taking property in violation of international law an opportunity to redress it by its own means, within the framework of its own legal system before the same alleged taking may be aired in federal courts.") (internal citation and quotation marks omitted). As the Seventh Circuit has explained:

> An alternative forum is adequate if it provides the plaintiff with a fair hearing to obtain some remedy for the alleged wrong. It is not necessary that the forum's legal remedies be as comprehensive or as favorable as the claims a plaintiff might bring in an American court. Instead, the test is whether the forum provides some potential avenue for redress for the subject matter of the dispute.

*Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009) (in the related context of *forum non conveniens*) (internal citations omitted). That is exactly what CIVS does: it provides a potential avenue for redress for Plaintiffs' claims. Actual redress need not be guaranteed; there are obvious reasons that cannot be the standard. Plaintiffs' assertions suggesting otherwise—for example, that 15% of claims are rejected—are unpersuasive.

Moreover, none of the asserted procedural obstacles deny relief to the extent that plaintiffs can claim that France provides no remedy at all. *See Fischer*, 777 F.3d at 861. The *Abelesz* court, after holding that exhaustion of domestic remedies is required before a plaintiff may assert a claim

for expropriation in violation of international law, remanded the case to the district court with instructions that the plaintiffs either exhaust any available Hungarian remedies or present a legally compelling reason for their failure to do so. On remand, "the district court held that [certain] non-judicial remedies 'were not truly available to Plaintiffs due to the time and circumstances surrounding the application for such remedies and certain limitations placed on recoveries under such remedies." *Id.* at 860 (quoting *Fischer v. Magyar Allamvasutak Zrt.*, No. 10-cv-00868, 2013 WL 4525408, at *1 (N.D. Ill. Aug. 20, 2013)). Whether those non-judicial remedies were adequate was not an issue on appeal. *See id.* With respect to judicial remedies, the Seventh Circuit noted that the plaintiffs had "not established that procedural rules would arbitrarily or unreasonably bar their claims" or "that structural or political circumstances would prevent Hungarian courts from providing a fair and impartial hearing for th[o]se claims." *Id.* at 860. Here, Plaintiffs have not shown that CIVS remedies are not truly available to them, that the Commission's rules would arbitrarily or unreasonably bar their claims, or that structural or political circumstances would prevent them from receiving a fair hearing.

With respect to the time and circumstances surrounding the application for CIVS compensation, Plaintiffs submit that it takes approximately three to five years to obtain a decision from the Commission, and approximately eight months after that to receive payment. Fraenkel's declaration states that it is not unusual for certain claimants to wait eight years to be indemnified. There is no doubt that eight, or even five, years is a long time, especially in this context where, as Plaintiffs' highlight, many claimants are elderly. But litigation in U.S. courts can drag on for just as long, if not longer. Moreover, CIVS was established in 1999. Plaintiffs waited over fifteen years to bring their claims, which undermines any assertion that the CIVS process is unreasonably prolonged. *See Abelesz*, 692 F.3d at 683 (rejecting plaintiffs' argument that any presently

available Hungarian remedy was unreasonably prolonged, and noting that plaintiffs waited until 2010 to file their complaints in the United States.).

Nor do the purported limitations on recoveries cited by Plaintiffs show CIVS compensation to be "so clearly inadequate so as to provide no remedy at all." *Fischer*, 777 F.3d at 867. *See also Abelesz*, 692 F.3d at 685 ("[D]omestic Hungarian remedies need not be perfectly congruent with those available in the United States to be deemed adequate.") First, as noted above, there are no actual limitations on the amount of compensation the Commission may award. Second, Plaintiffs have failed to provide convincing support for their contention that the Commission's awards are arbitrary and subjective. Indeed, they point only to one example in which the panel did not follow the recommendation of the rapporteur. Moreover, the same might be said of jury awards in the U.S. judicial system. Jury verdicts are certainly not predictable, and the parties do not get complete transparency into the jury's decision-making with respect to damages awards. That does not mean the system is broken. Finally, Plaintiffs assert that the compensation awarded is often substantially below current market value. Again, there is little evidence in the record to support that statement. And, as noted above, in at least one case, the Commission awarded compensation above and beyond what the claimant sought. An adequate alternative forum does not mean that recovery is guaranteed, much less that *full* recovery is guaranteed. In sum, "Plaintiffs have not shown that the remedies identified by [SNCF] are illusory." *Fischer*, 777 F.3d at 861.

Nor have Plaintiffs identified any procedural rule that would unfairly bar their claims. There is no statute of limitations or deadline for the submission of claims. With respect to the parties' dispute over good faith versus detailed and specific proof, even if it is true that some element of archival or other proof is required, that falls short of the preponderance of the evidence

standard that would be applied here. In that respect, CIVS does apply relaxed evidentiary standards that would inure to Plaintiffs' benefit. Finally, there is no indication that structural or political circumstances in France would prevent the Commission from giving Plaintiffs a fair hearing. Plaintiffs note that American claimants "do not have any faith in a quasi-independent commission in a country that let them and their relatives to be sent to the gas chambers." (Pls.' Resp. to U.S. Stmt. of Interest at 11, Dkt. No. 70.) The Court certainly understands that sentiment, but the Seventh Circuit has held that similar concerns "are too speculative to override the norm of requiring exhaustion of domestic remedies before resorting to foreign courts." *Fischer*, 777 F.3d at 847. *See also id.* at 860 ("[P]laintiffs have offered explanations for their understandable doubts about the ability of Hungarian courts to treat them fairly. We believe, however, that in the face of uncertainty, international comity requires that those courts be given the first opportunity to hear the claims rather than have foreign courts assume the worst about them.")

The Court's decision here is consistent with that of the district court in *Freund v. Republic of France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010). In *Freund*, which addressed claims virtually identical to those brought here, the court found that the FSIA's expropriation exception was inapplicable (and that SNCF was therefore entitled to sovereign immunity) because the plaintiffs had not adequately alleged that the expropriated property (or any property exchanged for such property) was owned or operated by SNCF. *Id.* at 561.[9] However, the court held that even if it had subject-matter jurisdiction pursuant to that exception, "the circumstances of the case would make abstention on justiciability grounds appropriate." *Id.* at 564. In its discussion of principles of

---

[9] The district court's decision in *Freund* was affirmed by the Court of Appeals for the Second Circuit, but only as to the dismissal of the plaintiffs' claims against SNCF on the grounds that they had not adequately alleged a taking. The Second Circuit did not reach the justiciability considerations on which the district court alternatively relied.

international comity, the *Freund* court explicitly concluded that the reparations programs in France, including CIVS, were "appropriate and adequate alternative fora for the pursuit of the eligible Plaintiffs' claims." *Id.* at 576. In so finding, the court rejected the plaintiffs' objections based on the administration of CIVS—in which they pointed to instances of arbitrary or biased decision-making, denials of representation, delays in claims processing, erroneous compensation calculations, and the futility of appellate review—finding that those objections were based more on anecdotes than systemic defects. *Id.* The court noted that, "while the CIVS process unquestionably diverges from United States litigation procedures," "such was the intention of its creators, who wished to focus on flexible and expedient recovery for as broad a class of victims as possible." *Id.* at 577–78. Plaintiffs here have failed to differentiate this case from *Freund* or to convince the Court that it should hold differently.

Finally, the United States has made clear its position that CIVS is not only an available and adequate alternative forum, but that it is meant to provide the exclusive remedy for claims such as Plaintiffs' claims. Regardless of whether the executive branch's views merit special deference, they are certainly entitled to some consideration. *Cf. id.* at 576 ("The Executive's views are entitled to particular deference where, as here, it chooses 'to express its opinion on the implications of exercising jurisdiction over particular [parties] in connection with their alleged conduct . . .'") (quoting *Republic of Austria v. Altmann,* 541 U.S. 677, 702 (2004)). Moreover, this Court agrees that the government's position is "bolstered by the fact that the United States [] continues to engage in diplomatic efforts aimed at supporting and improving these alternative fora." *Id.* at 569. While the 2014 Executive Agreement has no direct impact on Plaintiffs' claims, the fact that the United States and France continue to work together to enhance the French compensation programs suggests that to allow these claims to proceed in this forum would

undermine, or potentially interfere with, the two countries' efforts to create programs that are more effective and efficient than litigation.

In sum, based on the record, the Court finds that Plaintiffs' concerns about CIVS are based more on speculation and anecdotal evidence than any true structural or procedural defect that makes the process clearly inadequate. Many of the complaints about CIVS voiced by Plaintiffs might also be directed toward the U.S. judicial system. In fact, there appear to be many aspects of the Commission's framework that arguably make it a more favorable forum for Plaintiffs' claims than this Court. The basic argument put forth by Plaintiffs is that the recommendations of CIVS are not always equitable and the indemnification that it provides is not always adequate. That very well may be true. But if that were the applicable standard, what alternative forum would meet it? CIVS may not be perfect, but that does rise to a legally compelling reason for Plaintiffs' failure to exhaust its remedies.

Finally, Plaintiffs take issue with the "implication" in Jeannoutot's supplemental declaration that this lawsuit "is only about money." (Pls.' Sur-Reply in Opp. to Def.'s Mot. to Dismiss at 2, Dkt. No. 58-1.) They state that their goal is "to hold SNCF accountable for the commission of war crimes involving the taking of property while acting in support of genocide . . . to have SNCF accept responsibility for its actions, disgorge what it took and return that value to its victims." (*Id.*) The Court understands Plaintiffs' desire to hold SNCF responsible and—if it is in fact responsible for the expropriations at issue—to see the compensation to which they are entitled come out of SNCF's pocket. But there is no apparent authority for the proposition that a proposed alternative remedy may be found inadequate on account of who pays it.

The Court's legal analysis is not meant as any sort of commentary on the alleged wrongs committed by SNCF; it speaks only to whether those alleged wrongs are actionable in U.S. federal

court. As the *Freund* court aptly put it, "the Court concludes that the bounds of its jurisdiction are not coterminous with the moral force of Plaintiffs' claims." 592 F. Supp. 2d at 545. Because CIVS is the appropriate forum for Plaintiffs' claims, at least in the first instance, SNCF's motion to dismiss is granted and Plaintiffs' complaint is dismissed without prejudice. *See Citadel Sec., LLC v. Chicago Bd. Options Exch., Inc.*, 808 F.3d 694, 701 (7th Cir. 2015) ("A dismissal for lack of subject[-]matter jurisdiction is not a decision on the merits, and thus cannot be a dismissal with prejudice.") (internal citation omitted).

## CONCLUSION

For the reasons stated above, Defendant SNCF's motion to dismiss (Dkt. No. 18) is granted. This action is dismissed for lack of subject-matter jurisdiction, without prejudice to Plaintiffs pursuing their claims in the appropriate forum. The Clerk is directed to enter Judgment in favor of SNCF.

ENTERED:

Dated:  March 26, 2018

_____
Andrea R. Wood
United States District Judge